The defendant, Chester Williams, entered into two plea agreements -- one in 2010, the other in 2011 -- that included drug charges infected by the misconduct of former William A. Hinton State Laboratory Institute (Hinton Lab) chemist Annie Dookhan.[2] He moved in Superior Court to vacate his guilty pleas. A special judicial magistrate entered proposed findings and an order denying his motions, which were adopted by a judge. He now appeals. We affirm the order with respect to the 2010 plea agreement but reverse with respect to the 2011 plea agreement.
Background. 1. 2010 plea agreement. On October 3, 2008, Williams was charged with possession of cocaine with intent to distribute, subsequent offense, along with a school zone enhancement, which would have subjected him to a minimum mandatory sentence of five years for the possession with intent to distribute charge and two and one-half years from and after on the school zone enhancement (2008 case).[3] See G. L. c. 94C, § 32A(d ), as in effect prior to St. 2012, c. 192, § 14;[4] G. L. c. 94C, § 32J. The case went to trial, at which a judge granted Williams's motion for a required finding of not guilty on the school zone enhancement and the jury hung on the possession charge. This resulted in a mistrial.
At the plea hearing on February 17, 2010, the prosecutor represented that the Commonwealth would prove that, on August 20, 2008, police officers observed Williams sitting on a wall at a bus stop for about fifteen minutes in the Chinatown area of Boston. During that time, he had a conversation with someone who appeared to the officers to be a drug user, got on his bike, which was nearby, pedaled about sixty feet, and looked around in all directions. He stepped into an indentation in the wall, boosted himself up, reached behind the wall with his left arm, came down off the wall, and placed something in his mouth. He returned to the bus stop. Officers went to "where he had been," and recovered one plastic bag containing four smaller plastic bags, each of which contained twenty-five individually wrapped pieces of what was later tested to be cocaine. Dookhan was not involved in this case.
On January 1, 2009, Williams was indicted for distribution of cocaine, subsequent offense, with a school zone enhancement, which would have subjected him to a minimum mandatory sentence of five years on the distribution charge and two and one-half years from and after on the school zone enhancement (2009 case).[5] See G. L. c. 94C, § 32A(d ), as in effect prior to St. 2012, c. 192, § 14; G. L. c. 94C, § 32J. At the same plea hearing as the 2008 case, the prosecutor represented that the Commonwealth would prove that, on December 9, 2008, officers observed Williams being approached by approximately six people "in the area of Washington Street and Kneeland Street." One of them, George Macintosh, extended his hand to Williams, retracted it, and put something in his mouth. Officers approached Macintosh soon afterwards, and something fell out of his mouth, which was later tested to be cocaine. Macintosh telephoned someone he claimed was Williams, directed that person to a McDonalds, Williams appeared, and the officers arrested him. Dookhan was listed as the assistant analyst on the drug certificate in this case.
Williams pleaded guilty in the 2008 and 2009 cases in a single hearing. In exchange for his pleading guilty in both cases, the parties agreed that the Commonwealth would eliminate the subsequent offense portions of the charges in both cases, dismiss the school zone enhancement in the 2009 case, and recommend the following sentences: in the 2008 case, Williams was to receive one year in the house of correction, 290 days deemed served, the balance suspended for three months; in the 2009 case, he was to receive three months probation concurrent with the suspended sentence in the 2008 case. The judge followed the parties' joint sentencing recommendation.
2. 2011 plea agreement. On September 16, 2010, Williams was indicted for possession of cocaine with intent to distribute, subsequent offense (count I), and distribution of cocaine, subsequent offense (count III), each count with a park zone enhancement (2010 case).[6] He faced a minimum mandatory sentence of five years on the distribution and possession charges, and two and one-half years from and after on the park zone enhancements. See G. L. c. 94C, §§ 32A(d ) & 32J.
At the plea hearing on June 8, 2011, the prosecutor represented that the Commonwealth would prove with respect to count III that, on March 31, 2010, officers observed Williams, whom they had known from previous cases, walking near the Haymarket Massachusetts Bay Transportation Authority (MBTA) station, which was close to Holocaust Memorial Park. As he walked across the street, he spat some items into his hand and put them back in his mouth. He then met up with a man identified in the indictment as Bruce Shonefeld. The men exchanged something and split apart. The police detained, Mirandized, and recovered drugs from Shonefeld, who told the officers that he paid his dealer sixty dollars in three twenty-dollar bills, and provided the dealer's phone number. The drugs were later tested to be cocaine. The officers then arrested Williams, who was found with sixty dollars in three twenty-dollar bills in his front right pocket. Police recovered an additional $225 in cash. Williams provided an address of a homeless shelter. The police recovered two cellular telephones from Williams, one of which rang during booking. Dookhan was listed as the assistant analyst on the drug certificate corresponding to this count.
With respect to count I, the prosecutor represented that the Commonwealth would prove at trial that, on April 12, 2010, Williams's social worker called the West End Shelter at the Eric Lindemann Center -- which was not the shelter whose address Williams had provided to police on March 31 -- to collect his belongings. Some of his belongings were in a locker; the prosecutor did not say whether the locker was locked or unlocked.[7] When shelter employees opened the locker, they found a small plastic bubble gum container, in which they found twenty-one individually-wrapped bags containing what appeared to be drugs and four to five loose rocks, all of which was later confirmed to be cocaine. Dookhan was not involved in the testing of these drugs.
At this plea hearing, Williams expressed some hesitation in his decision to plead guilty. Although he never stated that he intended to plead not guilty on count III, and initially indicated that he would be pleading guilty on it, he then asked for "more time to think it over." The judge granted a recess, after which Williams reaffirmed his intent to plead guilty on count III. However, after the prosecutor represented what the Commonwealth would prove with respect to count I, Williams initially said that he was not guilty of that offense and that he wanted a trial. After a recess at which he conferred with counsel, counsel reaffirmed that Williams wanted a trial on count I. The judge then heard arguments on whether to grant an evidentiary hearing on Williams's motion to suppress the drugs found at the West End Shelter, and took another recess. After this recess, but before the judge rendered a decision, Williams pleaded guilty to count I.
In exchange for his pleas, the Commonwealth agreed to drop the subsequent offender portions of both charges, as well as the park-zone enhancements. The parties also agreed to a sentencing recommendation of three years in State prison on count III and one year of probation from and after on count I. This agreement also required Williams to admit to violating his probation in the 2009 case, for which he received a sentence of three years concurrent with the sentence on count III. The judge accepted this recommendation.[8]
Analysis. A motion to vacate a guilty plea is treated as a motion for a new trial under Mass.R.Crim.P. 30(b), as appearing in 435 Mass. 1501 (2001), which we review for a "significant error of law or other abuse of discretion." Commonwealth v. Scott, 467 Mass. 336, 344 (2014), quoting from Commonwealth v. Sherman, 451 Mass. 332, 334 (2008). "The judge's findings of fact are to be accepted if supported by the evidence, and he is the 'final arbiter of matters of credibility.' " Ibid., quoting from Commonwealth v. Schand, 420 Mass. 783, 787 (1995).
To succeed, motions for a new trial based on government misconduct, such as this one, must satisfy two prongs. First, the defendant must show that "egregious government misconduct preceded the entry of his guilty plea and that it is the sort of conduct that implicates the defendant's due process rights." Id. at 347. In cases where Dookhan signed a certificate of analysis in the role of assistant analyst, the defendant is entitled to a "conclusive presumption" of "egregious government misconduct." Id. at 352. As the judge and special judicial magistrate found, Williams satisfied this prong by introducing certificates of analysis with respect to the 2009 case, and count III of the 2010 case, on which Dookhan's signature appears on the "assistant analyst" line.
To satisfy the second prong, the defendant must show a "reasonable probability that he would not have pleaded guilty had he known of Dookhan's misconduct." Id. at 355. In Scott, the Supreme Judicial Court identified as many as thirteen nonexhaustive factors that are relevant to the reasonable probability test, but emphasized that this is a "totality of the circumstances" determination. Id. at 358. The reasonable probability determination 'must be based on the actual facts and circumstances surrounding the defendant's decision at the time of the guilty plea in light of the one hypothetical question of what the defendant reasonably may have done if he had known of Dookhan's misconduct."Id. at 357. Williams's argument, essentially, is that the special judicial magistrate and the judge abused their discretion by overestimating the benefits of the deals to Williams and underestimating his "substantial ground[s] of defense," both of which are relevant factors under Scott. Id. at 356.
1. 2010 plea agreement. This plea agreement presents a knotty problem. We agree with the defendant that, without the certificate of analysis in the 2009 case, the Commonwealth's case as to the 2009 charges would have been extremely weak; indeed, there may well have been insufficient evidence to support a conviction. See Commonwealth v. Gaston, 86 Mass. App. Ct. 568, 574 ("[P]roof of Dookhan's wrongdoing as it related to the defendant's case provides its own shadow of reasonable doubt about the nature of the substances tested"). We have been told by the Supreme Judicial Court that in these circumstances we may not consider the possibility that the drugs could be retested (something that, in any event, raises a serious question given Dookhan's handling of evidence in the Hinton Lab). See Scott, 467 Mass. at 357-358. Furthermore, there is no evidence of a field test of the alleged drugs, nor a witness who might have testified to the nature of the substances. Given this, the Commonwealth likely would have had insufficient evidence of the composition of the substance that it alleged was cocaine.
Yet, however weak the evidence was in the 2009 case, the fact remains that, as a result of this package deal in which the 2008 charges were also resolved, Williams received what effectively amounted to time served and a seventy-five day sentence suspended for three months for a crime that carried a five-year minimum mandatory sentence in the 2008 case, and nothing additional on this count. Though we have no details, the fact that the jury had hung on the 2008 charge means that there was some risk of conviction after retrial, which would have been a genuine concern, rendering time served and a seventy-five day sentence suspended for three months an excellent bargain. On top of that, the three months of probation Williams received in the 2009 case were concurrent with the suspended sentence in the 2008 case.
Although we have some difficulty concluding with respect to a case that very likely could not have been won at trial, that there was no "reasonable probability that he would not have pleaded guilty had he known of Dookhan's misconduct," there may have been reluctance on Williams's part in this case to upset the apple cart of the package deal. It may well be that we should not take into account the fact that in such a circumstance a prosecutor might withdraw a deal on one charge despite a refusal to plead to a charge on which such thin evidence remained, but given our standard of review -- which is for abuse of discretion -- in the absence of further guidance from the Supreme Judicial Court on the issue we do not think the motion judge is foreclosed from doing so. We therefore hold that there was no abuse in discretion in finding that, had Williams known of Dookhan's misconduct, he would nonetheless have entered into the 2010 plea agreement.
2. 2011 plea agreement. With respect to the Dookhan-infected count III at issue in the 2011 plea agreement, we also think the remaining case was weak. In describing the evidence on this count, the special judicial magistrate said,
"The incident that occurred on March 31, 2010[,] was observed by a number of police officers. The buyer was found with cocaine on his person, and he immediately identified the defendant as the person who sold him the drugs. The defendant had [sixty dollars] in his right front pocket, consistent with the amount the buyer had stated he gave the defendant in exchange for the drugs. The grand jury minutes indicate that the buyer gave the police the phone number by which he had contacted the defendant."
Although there was certainly evidence that a transaction involving drugs had occurred, we agree with the defendant that in the absence of the Dookhan-tainted certificate, the Commonwealth would have been hard-pressed to identify the drug as cocaine, which is a necessary element of the offense. Once again, there is nothing to indicate that the Commonwealth performed a field test on the substance, nor was there a witness who had used it and could testify to what it was. Even had the Commonwealth been able to track down Shonefeld, he could have refused to testify by asserting his privilege against self-incrimination. Given the absence of other evidence of composition, Williams might well have had prevailed at trial on this count. Indeed, the transcript of the plea hearing indicates that he was reticent to go to trial even without knowing of Dookhan's misconduct.
As our analysis above suggests, given that this was a package deal on counts I and III, the strength of the Commonwealth's case with respect to count I, the non-Dookhan-tainted charge is also relevant to our analysis since, had Williams rejected the deal, he would have had to proceed to trial on it as well. Although there is no reason to doubt the accuracy of the certificate of analysis here, we agree with the defendant that the Commonwealth's case was not strong. The drugs were found in a locker in a homeless shelter when a third party went to retrieve some of Williams's belongings some twelve days after the defendant was arrested. The prosecutor did not proffer any evidence that the locker was locked or that only Williams (and shelter staff) had access to it. Nor did the prosecutor even proffer evidence of when Williams was last at the West End Shelter. He gave a different address to police on March 31 suggesting that he did not stay there consistently.[9] The absence of such evidence could have provided the requisite reasonable doubt as to whether the drugs found in the locker belonged to Williams. Further, that Williams himself and through his counsel twice indicated that he would plead not guilty on this count is still more evidence of the weakness of the Commonwealth's case as he understood it and his willingness to take his chances at trial, both of which are relevant to the reasonable probability analysis under Scott. See Scott, 467 Mass. at 355.
The special judicial magistrate also found that Williams received a "generous" deal in part because it allowed him to dispose of his probation violation without adding any incarceration beyond what he was getting as a result of his guilty plea on count III. But the generosity of this term presupposes that, had he gone to trial, he both would have been incarcerated and would have been found in violation of probation. Our analysis above shows that he had a substantial ground of defense on both counts and therefore very well could have avoided incarceration on them. Furthermore, the basis for Williams's alleged probation violation was the crimes he pleaded guilty to committing at the hearing. Although it would have been easier for the Commonwealth to prove a probation violation given the lower standard of proof that applies to probation violations, see Commonwealth v. Holmgren, 421 Mass. 224, 226 (1995) (Commonwealth need only prove probation violations by preponderance of evidence), the Dookhan-tainted certificate in count III, and the general weakness of the Commonwealth's case in count I, suggest that Williams had a chance of prevailing here as well. The tainted certificate at least would have given him leverage to negotiate a better deal on the probation violation.
In addition, the Dookhan-tainted count in the 2011 plea agreement accounted for the entirety of Williams's incarceration in that case (apart from the probation violation), which suggests that it was the "driving force behind the plea," Commonwealth v. Williams, 89 Mass. App. Ct. 383, 389 (2016), as does the fact that, absent the Dookhan taint, the Commonwealth's case on count III was much stronger than it was on count I.
In these circumstances, it would have been rational for Williams to proceed to trial. This, plus the fact that he had almost already done so, implies that, had he known of Dookhan's misconduct, there is a reasonable probability that he would have chosen to go to trial.
Conclusion. The order denying Williams's motion to vacate his guilty pleas in the 2010 plea agreement is affirmed. The order denying Williams's motion to vacate his guilty pleas in the 2011 plea agreement is reversed, and the findings are set aside.
So ordered.
Affirmed in part; reversed in part.

For an overview of Dookhan's misconduct, see Commonwealth v. Scott, 467 Mass. 336 (2014).

Superior Court docket number 2008-10946.

In 2012, the Legislature reduced the minimum mandatory sentence under G. L. c. 94C, § 32A(d ), to three and one-half years.

Superior Court docket number 2009-10069.

Superior Court docket number 2010-10982.

At the evidentiary hearing before the special judicial magistrate, the attorney who represented Williams at the 2011 plea hearing testified that he believed there were no locks on the lockers. Neither the special judicial magistrate nor the judge made a finding on this issue.

The judge also terminated Williams's probation in the 2008 case at the request of the probation officer.

That Williams's social worker had to request West End Shelter staff to retrieve his belongings suggests that Williams was unable to do so. It is thus also likely that Williams had been held in jail since his March 31 arrest, such that he had not been at the West End Shelter for, at a minimum, nearly two weeks before the drugs were discovered.